City of Pittsburgh,          :
          Petitioner     :
                                  :
          v.           : No. 1568 C.D. 2015
                                  : Submitted: March 18, 2016
Unemployment Compensation   :
Board of Review,            :
          Respondent   :


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI         FILED: April 21, 2016


        The City of Pittsburgh (Employer) petitions for review of an order of the Unemployment Compensation Board of Review (Board) finding Cosette M. Grant-Overton (Claimant) not ineligible for unemployment compensation benefits under Section 402(b) of the Unemployment Compensation Law (Law)[1] because she quit her

---

[1] Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§751–914. Section 402(b) renders an employee ineligible for compensation for any week:

> [i]n which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature, irrespective of whether or not such work is in "employment" as defined in this act: Provided, That a voluntary leaving work because of a disability if the

**(Footnote continued on next page…)**

job due to a hostile work environment constituting cause of a necessitous and compelling nature. For the reasons that follow, we affirm.

## I.

Claimant was employed as the Manager of Educational Policy and Workforce Development in Employer's Bureau of Neighborhood Empowerment from April 1, 2014, through October 3, 2014, under the supervision of Dr. Curtis Porter, Chief Education and Neighborhood Reinvestment Officer. In August and September 2014, Claimant made internal complaints regarding Dr. Porter's conduct before directly addressing the issues with him via e-mail dated September 23, 2014.

Specifically, by e-mail dated August 6, 2014, Claimant advised Kevin Acklin, Mayor of Pittsburgh William Peduto's Chief of Staff, as follows:

> As per our brief hall conversation on Monday about issues with Dr. Porter and my complaints of his raising his hand at me, his claim that he is paid to chill and I am to do the work, his not showing up for meetings and events, and him dumping all of his work load on me, I attempted to reach out to Laurie Dierker to set up a one on meeting [sic] with you to discuss for Tuesday at 9:30am and she indicated your availability. I stopped by and you were not there. I followed up for today and Laurie indicated for me to stop by at 4:30, I showed up and you were not present. I

---

**(continued…)**

employer is able to provide other suitable work shall be deemed not a cause of a necessitous and compelling nature….

43 P.S. §802(b).

2

appreciate you having my back. I also appreciate you indicating that we are on the same team and you acknowledging that I am working and often late. In particular, I would like to discuss work load issues and working more separately from Dr. Porter. His recent hand raising has be [sic] concerned and I would feel more comfortable working away from him as much as possible. Please let me know. Thanks in advance for handling this.

(Reproduced Record [R.R.] at 119a.)

After receiving no response from Mr. Acklin, Claimant reached out to Deb Lestitian, the Chief Administration Officer, who advised her to memorialize her complaints in a memorandum. Consequently, Claimant submitted a memorandum dated September 8, 2014, to Ms. Lestitian, requesting that the "work load and hostile work environment issues" with Dr. Porter be amicably resolved. (*Id.* at 120a.) In the memorandum, she noted that she approached Ms. Lestitian to further discuss her issues with Dr. Porter after receiving no response from Mr. Acklin, despite her attempts to follow up. She clarified:

> my interest is not to get rid of him, but rather to define our work load and separate from him, given the hostile work conditions and that I did not feel comfortable one on one with him given recent incidents of him raising his hand at me as if he were going to hit me and also him harassing me during times I needed to leave for spousal related events.

(*Id.* at 120a.) She summarized that as per their oral discussion, Ms. Lestitian agreed to "get back to [Claimant] in two days" after following up on the complaint. (*Id.*)

3

After receiving no response, Claimant submitted a second memorandum dated September 18, 2014, to Ms. Lestitian. Claimant acknowledged that as of that date, Ms. Lestitian was out of the office for a medical issue. Claimant advised that she was leaving for a vacation in California but would return to work on September 29, 2014, after which she looked forward to discussing developments and the next steps regarding her complaint.

On September 23, 2014, while Claimant was on vacation, a contentious e-mail exchange took place between her and Dr. Porter in which Claimant advised him that "[t]hese temper tantrums of yours—verbal and sometimes physical threats are happening far too frequently and seem to occur when I am away or busy with family matters." (*Id.* at 123a.) While still in California, she learned that Employer launched an investigation into her residency and agreed to participate in an interview after her return. On October 1, 2014, following her interview, she also updated her personnel file with a copy of her updated driver's license and real-estate property tax payment receipt, both of which reflected an address within the City of Pittsburgh.

Subsequently, by letter dated October 3, 2014, the Mayor's Office advised Claimant that an October 1st investigative report from the Mayor's Office found that Claimant resided in Ross Township rather than in the City of Pittsburgh as required by Section 711 of the City of Pittsburgh Code of Ordinances (Ordinance) providing:

> §711.—RESIDENCY REQUIREMENTS FOR ALL CITY EMPLOYEES.

4

> All City employees and officials, including Police and Fire Bureau personnel, shall be domiciled in the City at the time of their initial appointment and shall continuously maintain their domicile within the City throughout their terms of employment with the City.

Ordinance §711. Employer advised Claimant that she must either provide the required documentation to demonstrate her residency within the City or resign by October 6, 2014. The same day, Claimant submitted a letter of resignation, stating in relevant part:

> I write to tender my resignation, effective October 15, 2014. I am on a 7 work day sick leave and under Doctors [sic] orders until that time. I along with the Doctor's office have provided that documentation to personnel on October 3, 2014. I am resigning based on a hostile work environment that I have been subjected to span over 6 months (April, 2014 to present). Four of the hostile incidents were documented, reported to the appropriate staff in your office, but were never addressed. In particular, the fourth hostile incident was reported verbally to Debbie Lestitian, as recent as September, 2014, and despite her promise to follow up in two days, she never did. As a result of all four reported incidents, I believe the recent harassment, threats and intimidation from city police towards my family and I to be potentially retaliatory actions as a result of my previously reported hostile incidents.

(R.R. at 20a.)

Subsequently, Claimant submitted a claim for unemployment compensation benefits, explaining:

5

It was e[rrone]ously reported that I was not a resident of [P]ittsburgh. I was in California when the investigation got underway. There was a forced investigation done while I was out of state. There was an [sic] harrasment [sic] for me to come back to the city so that as part of the investigation to come back to prove that I was a resident.

(*Id.* at 6a.) Employer disputed Claimant's position, alleging that Claimant voluntarily resigned prior to taking steps to preserve her job.

The Lancaster Unemployment Compensation Service Center (Service Center) determined that Claimant satisfied her burden of proving a necessitous and compelling reason for leaving her job in that she demonstrated a hostile work environment, intimidation and harassment, of which she informed Employer prior to leaving. Employer appealed, asserting that Claimant "voluntarily resigned without exhausting any alternatives prior to quitting" and "did not discuss any work-related issues nor take any steps to preserve the job prior to quitting," thus depriving Employer of the opportunity to address the complaints alleged in her resignation letter. (*Id.* at 27a.)

At the hearing before the Referee, Claimant testified that she resigned because she was subjected to physical threats from her immediate supervisor, Dr. Porter, and despite her repeated written and oral complaints, the issue was never addressed and continued. Specifically, she testified:

I got the physical raise of the hand like I was going to get hit. When I was discussing—we were discussing work-related issues that were a concern about workload, and I felt that he was going to hit me. And so immediately upon leaving his office I made it know [sic] to Kevin Acklin

6

who's the Chief of Staff who was coincidentally coming out—down the hall as I was leaving the office, and I shared with him what happened and he said let's, you know, talk about it soon. And so I wrote him a memo. I wrote him and [sic] e-mail and tried to set up an appointment and kept trying to meet with him. In between that time, I—it happened again. It happened where Dr. Porter raised his hand again, once again in conflict about some work-related issues. And he, you know, stood up like he was going to hit me with his hand, with his right hand. And, I immediately went to Latrinda Leonard (phonetic) who is the Deputy of Administration for the City who works two doors down from me, and I went to her to talk to her about it. She said we need to talk to Deb Lestitian about it. I talked with—so this was immediately upon him raising his hand. I went to Deb Lestitian about, [sic] talked to her, and she said memo me and I'm going to get [to] the bottom of this. We had a level of discussion about what happened, what my issues were. I let her know that I had talked to Kevin Acklin but that he did not respond. There was never a response from anyone, and, my concern was that I was—I had to work with this gentleman ongoing, the way which our work structure was and that I felt threatened and I didn't know what he would continue to do, that he was in a position of authority, and so Deborah said she'd get back to me in two days. She didn't get back to me in two days after me trying to follow up with her. And, she went out on some kind of leave or—I don't know what happened, but she was not around. And, so, that would have meant I filed—so I gave a letter to Kevin Acklin initially August 5th, 6th, somewhere around there, and then I—then there was a few other incidents with Dr. Porter. I made it known to Latrinda Leonard and to Deb Lestitian both being physical threats. And, that would have been September—mid September—I'm rough on dates, but—and then toward the end before I left on vacation, I followed up with Deborah again in writing to say nobody's responded. Kevin hasn't responded. You haven't responded. I've made these complaints. I still feel threatened here. I want to address these issues, and, there was still no response.

7

(*Id.* at 74a–75a.)

She further explained that after following up with Ms. Lestitian, she left for vacation for five days, during which time an internal investigation was initiated regarding her residency. She concluded that because the investigation began after she repeatedly made it known that she was working in a hostile environment, she was being retaliated against, particularly since her residency had already been approved when she assumed the position. As such, she resigned.

Specifically, she stated that she learned her residency was being investigated when her husband informed her while she was on vacation that a plain-clothes officer came to their home and inquired regarding her residency. According to Claimant, her husband advised the officer that she lived in the City during the workweek. While still on vacation, Claimant contacted Mayor Peduto to resolve the issue, and he suggested that she reach out to the Solicitor, who recently had a similar issue. Nonetheless, Deborah Walker, a City employee, informed Claimant that the investigation could not be held off until her return and that her husband needed to travel to her weekday home from out of town to provide the investigators access. She testified that after she returned, Detective Gahr interviewed her regarding her residency and despite her request for a copy of the complaint which was the impetus for the investigation, he would not provide one.

Regarding her residency, she testified that since beginning her management position in April 2014, she lived at an address in the City and registered to vote at that residence. She stated that she owned the home since 1991, and

although she did not live there continuously, she did move back into it in April 2014 for the purposes of accepting her job with Employer. She submitted a copy of her voter registration, which went into effect ten days after April 29, 2014, reflecting a City address. She also submitted a June 2014 e-mail she sent to the Mayor regarding alleged code violations at her City residence for which she previously sought his help in obtaining an extension.

Additionally, Claimant offered an October 3, 2014, note from Jeannette E. South-Paul, M.D., advising that Claimant was under her medical care and should remain on bedrest for seven days before re-evaluation. She stated that she attached this note to her resignation letter and provided it to Employer.

On cross-examination, she advised that she and her husband have dual residence, and that she presented Detective Gahr bills from those properties bearing both her and her husband's names but that he refused to accept them. She also submitted the Declarations page from a Liberty Mutual Fire Insurance Policy with a policy period of October 1, 2014, through October 1, 2015, which listed her and her husband as the insureds of a residence in the City. In response to an inquiry regarding why Claimant would quit her job pending an investigation into her residency if she could, in fact, satisfy the residency requirement, Claimant stated:

> The investigation was further retaliation for my complaint. I'm sorry. I was getting threatened, you know, physical. No one did anything. No one seemed to care in that environment. And, it just kept escalating, one thing after another. I mean, a few—several times this man raised his hand, verbal, bothering me while I'm in California, bothering me while I'm away on—while I'm away for a day or two for husband's stuff, and, I come back—or while I'm

9

gone, which you all knew. Everyone knew I was in California and to insist that you do an investigation while I'm in California. You go to my kids' school, you know, and harassing me about residency all of a sudden. And, so that was my final straw.

(*Id.* at 99a.) She testified that she never received the October 3, 2014 letter from the Mayor's Office regarding her need to substantiate her residency or resign.

In support of its appeal, Employer presented the testimony of Detective James Gahr, who stated that he was assigned a residency investigation regarding Claimant, pursuant to which he conducted surveillance, which was inconclusive, and collected documentation from her personnel file. He also contacted the United States Postal Inspection Service and learned that Claimant was receiving her mail at an address outside the City of Pittsburgh, in Ross Township. He unsuccessfully attempted to contact her Ross Township neighbors and then contacted Claimant for an interview, requesting that she provide any documentation relevant to establishing her residency in the City. According to Detective Gahr, during Claimant's October 1, 2014 interview, she provided documentation bearing only her husband's name with respect to the City address and, therefore, his final report showed that she failed to establish her residency in the City. He also submitted the tax records for the City property, indicating $182.11 in unpaid taxes for years 2013 and 2014.

On cross-examination, Detective Gahr admitted that Employer required information concerning residency upon hire, which was previously provided by Claimant, and that Claimant advised him during his investigation that she continued to live at that address in the City. He, however, failed to inquire whether she kept

10

clothes there, ate meals there or took part in activities of daily living at that address. He acknowledged that although Claimant requested a copy of the complaint, one was not provided, noting that the investigation was prompted by an anonymous tip. He further acknowledged that Employer mailed correspondence to Claimant at her City address but denied knowing if Claimant actually received those letters at that address.

Following the hearing, the Referee reversed the Service Center's determination, finding that: (1) although Claimant had complaints regarding Dr. Porter's conduct, "she did nothing about those complaints when they first occurred on August 6, 2014 and September 8, 2014 other than writing letters of complaint," (*Id.* at 138a); (2) during the investigation, Claimant did not submit any documentation linking the City property to her name; and (3) the same day that the Chief of Staff informed her that she must submit proof of her residency or resign, Claimant resigned. As such, the Referee concluded that Claimant voluntarily resigned without exhausting alternatives and, therefore, denied her benefits under Section 402(b) of the Law, 43 P.S. §802(b).

On further appeal, the Board reversed, crediting Claimant's testimony regarding her working relationship with Dr. Porter. The Board emphasized the timing of Employer's residency investigation and concluded that it was conducted to further harass Claimant. Regarding the merits of the investigation, the Board credited Claimant's testimony that she lived in the City during the workweek and resolved any disputes in the testimony in her favor. Because the Board found that Claimant did not receive Employer's October 3, 2014 letter and attempted to resolve her issues to no avail before resigning, the Board concluded that her resignation was consistent with

11

common sense. As such, the Board held that she was not ineligible for benefits under Section 402(b) of the Law. This appeal followed.

## II.

On appeal,[2] Employer contends that the Board's finding that Claimant had a necessitous and compelling reason for quitting is not supported by substantial evidence. In this respect, an employee who alleges that she left her position for a necessitous and compelling reason bears the burden of proving that: "(1) circumstances existed which produced real and substantial pressure to terminate employment; (2) such circumstances would compel a reasonable person to act in the same manner; (3) the claimant acted with ordinary common sense; and, (4) the claimant made a reasonable effort to preserve her employment." *Brunswick Hotel & Conference Center, LLC v. Unemployment Compensation Board of Review*, 906 A.2d 657, 660 (Pa. Cmwlth. 2006). In the context of hostile work environment cases, abusive conduct constitutes adequate justification to quit, so long as an employee notifies her superiors of the harassing or abusive conduct. *Porco v. Unemployment Compensation Board of Review*, 828 A.2d 426, 428 (Pa. Cmwlth. 2003).

---

[2] Our review is limited to determining whether the Board's findings of fact are supported by substantial evidence in the record, whether errors of law were committed, whether agency procedure was violated, or whether constitutional rights were violated. *Gillins v. Unemployment Compensation Board of Review*, 633 A.2d 1150, 1153 (Pa. 1993). We have defined "substantial evidence" as such "relevant evidence that a reasonable mind might consider adequate to support a conclusion." *Palladino v. Unemployment Compensation Board of Review*, 81 A.3d 1096, 1100 n.3 (Pa. Cmwlth. 2013).

Specifically, Employer claims that Claimant failed to establish real and substantial pressure to terminate her employment because she was not harassed by the residency investigation and because Employer was addressing her concerns regarding Dr. Porter through its action plan. In support of the assertion that it created an action plan, Employer cites Claimant's September 18, 2014 follow up memorandum to Ms. Lestitian. The record, however, belies this argument.

First, the Board's conclusion that Dr. Porter's conduct created real and substantial pressure for Claimant to quit is supported by substantial evidence. Claimant noted, in at least one conversation with Mr. Acklin, one e-mail to Mr. Acklin, two memoranda to Ms. Lestitian, and an e-mail she directed to Dr. Porter, herself, her concerns regarding Dr. Porter's conduct. She testified, consistent with those exchanges, that Dr. Porter raised his hand at her on two separate occasions, giving rise to her fear that he was going to strike her. Yet, despite her repeated reports of this conduct, no further action was taken. Instead of investigating Dr. Porter's conduct, while Claimant was on a scheduled vacation in California, Employer launched an investigation into her residency as per an "anonymous" tip.[3] As the Board noted, Employer's initiation of this investigation during the small window of time when Claimant was known to be out of town so close to the time Claimant voiced her complaints gives rise to the inference that the investigation was retaliatory. That is particularly true considering that while Employer actively investigated Claimant's residency, it took no action regarding her hostile work

---

[3] We decline Employer's invitation to speculate who may have provided the tip due to the absence of evidence in the record on this point.

environment complaints, even though Employer admitted that Claimant satisfied the residency requirement before beginning employment.[4]

Contrary to Employer's argument, the fact that the record does not contain evidence showing that the timing of the residency investigation imposed a hardship upon Claimant does not alter this outcome. *See Hoffmaster v. Workers' Compensation Appeal Board (Senco Products, Inc.)*, 721 A.2d 1152 (Pa. Cmwlth. 1998) (explaining that "in a substantial evidence analysis…the pertinent inquiry is whether there is *any evidence* which supports" the agency's decision below. (emphasis added)). As shown by Claimant's doctor's note, these circumstances created real pressure upon Claimant, for which Claimant sought medical treatment.

Moreover, the mere fact that Claimant submitted a second memorandum to Ms. Lestitian outlining her continued concerns after Employer failed to respond to previous communications does not in any way evidence that Employer devised an "action plan." Rather, such evidence illustrates Employer's continued failure to address the alleged conduct in any meaningful manner and only further supports the conclusion that Employer's lack of response contributed to the hostile work environment.

Finally, we find meritless Employer's argument that Claimant failed to make a reasonable effort to preserve her employment. Indeed, as discussed above, Claimant addressed her concerns on at least four different occasions with several

---

[4] We make no judgment in this opinion with respect to whether Claimant was a City resident at the time of her dismissal.

14

individuals and on a separate occasion with Dr. Porter himself. Regardless of whether Claimant specifically stated in the claim she filed with the Service Center that Dr. Porter was the cause of her resignation, she did state that she quit because she was "threatened" and subjected to a hostile, harassing environment. These statements align with the resignation letter she submitted over a month before filing her claim, expressly noting that she resigned due to "a hostile work environment" that spanned over the course of six months, Employer's failure to address her concerns, and retaliatory action she faced as a result of her complaints. As such, the Board's conclusion has more than substantial support in the record.

Accordingly, we affirm the Board's decision finding that Claimant is not ineligible for unemployment compensation benefits pursuant to Section 402(b) of the Law, 43 P.S. §802(b).

DAN PELLEGRINI, Senior Judge

15

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh,                         :
                    Petitioner              :
                                            :
        v.                                  : No. 1568 C.D. 2015
                                            :
Unemployment Compensation                   :
Board of Review,                            :
                    Respondent              :

# **O R D E R**

AND NOW, this 21st day of April, 2016, the order of the Unemployment Compensation Board of Review dated July 27, 2015, at No. B-580582, is affirmed.

_____
DAN PELLEGRINI, Senior Judge